UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| DALE E. BURTON,<br>     Plaintiff,<br><br>v.<br><br>S.D. WARREN COMPANY d/b/a Sappi Fine Paper North America,<br>     Defendant. | Civil Action No. _____ |

## COMPLAINT FOR INJUNCTIVE RELIEF UNDER FMLA

Plaintiff Dale E. Burton ("Burton"), by and through its undersigned counsel files this Complaint against Defendant S.D. Warren Company d/b/a Sappi Fine Paper North America ("Sappi") as follows.

## NATURE OF THE ACTION

1.   At this stage, Burton seeks injunctive relief against Sappi for reinstatement of employment and benefits retroactive to his date of termination, March 2, 2017, pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. §2601 et. seq. as specifically authorized by 29 U.S.C. §2617(a)(1)(B).

## PARTIES

2.   Burton is an individual citizen residing in Westbrook, Maine.

3.   Sappi is a Pennsylvania corporation with a place of business in Westbrook, Maine.

## JURISDICTION AND VENUE

4.   This Court has subject matter jurisdiction over Burton's FMLA claims pursuant to 28 U.S.C. §1331.

5.   Venue is proper in this district pursuant to 28 U.S.C. §1391(a) and (b).

6. Injunctive relief is authorized and is appropriate for an employer's interference with an employee's exercise of FMLA rights as protected by 29 U.S.C. §2615 (a)(1).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### *Employment History*

7. Burton was hired on April 14, 1980, as a production employee and was specifically employed as a winder operator.

8. This was an hourly position and Burton was represented by a union.

9. Burton suffered work-related injuries on March 27, 1984 and February 27, 1986 significantly limiting his ability to use his upper extremities.

10. As a result of the continued deterioration of his physical condition, Burton was promoted on May 30, 2005 to a Shift Supervisor in the Ultracast Administration department.

11. With this promotion, Burton no longer had union representation or protection.

12. Brandi S. Couture ("Couture") has for all times material to this Complaint been the manager of the Ultracast Administration department and Burton's manager.

13. As a shift supervisor, Burton is required to work a rotating schedule, referred to as a tour, which involves working three different shifts which rotate weekly.

14. These shifts run as follows:

| Shift Name | Shift Hours |
|---|---|
| Days | 6 a.m. – 2 p.m. |
| Set Up | 2 p.m. – 10 p.m. |
| Get Up | 10 p.m. – 6 a.m. |

15. Crews and supervisors rotate weekly among the three shifts in the following order: Get Up, Set Up, and Days.

16. This rotation makes for a particularly tough adjustment over 36 hours between Set Up and Days which would involve, for example, working until 10 p.m. on a Thursday and then starting work at 6 a.m. on a Saturday.

### *Development of Serious Health Condition*

17. In 2015, Burton noticed that he was having difficulty concentrating, a hard time remembering things, and that he was more prone to outbursts.

18. In conjunction with the review in late October or early November 2015 with Couture of Burton's 2015 Performance Management Plan ("PMP") Couture commented that she had observed that Burton appeared to be encountering difficulties and asked about this.

19. In response, Burton explained that he was having difficulty concentrating, a hard time remembering things, that he was more prone to outbursts and was frustrated by this.

20. Couture arranged for Burton to be seen in the Sappi medical department by Dr. Glazier which examination took place in late 2015.

21. In conjunction with this examination Dr. Glazier determined that Burton could still perform his job.

22. Thereafter Burton made an appointment to be seen by his primary care provider regarding his condition.

23. This resulted in Burton being referred to a neurologist, Eric Dinnerstein ("Dr. Dinnerstein").

24. It took some time to be scheduled to be seen by Dr. Dinnerstein and Burton was not examined by this physician until late 2016.

25. Dr. Dinnerstein indicated that the likely source for Burton's difficulty concentrating, hard time remembering things, and being more prone to outbursts was a sleep disorder which probably stemmed from the rotating shifts Burton worked.

26. Burton communicated these findings from Dr. Dinnerstein to Couture.

27. No accommodation was offered by Sappi in response.

## *Most Recent Events*

28. On or about February 23, 2017, Burton's immediate supervisor, Colby Allen ("Allen"), learned that a few weeks prior Burton may have been involved in another outburst.

29. This outburst involved using an inappropriate term in referring to a plant engineer in the course of expressing frustration to a co-worker.

30. As a result of learning about this outburst, Couture and Allen met with Burton on February 24, 2017.

31. At this meeting, Burton was asked if he felt he could still do his job.

32. Burton's response is set out below and quoted from Allen's notes:

> [Burton] admitted that he could no longer do the job. He said he was having a hard time remembering things which makes him very frustrated because doctors can't find anything wrong with him.

33. Burton was sent home on February 24, 2017, and "was told that we would call him when we were ready to discuss further".

34. On March 2, 2017, Burton was called to a meeting with Couture, Allen, and Matthew Reyer ("Reyer"), Human Resources Manager.

35. At the March 2, 2017 meeting, Couture announced to Burton that they were going to part company.

4

36. At the March 2, 2017 meeting, Burton was told that he was being terminated because he admitted to Couture on Friday, February 24, 2017, that he could no longer do his job.

37. Couture and Allen then left the meeting.

38. There was no discussion.

39. Burton was left with Reyer who confirmed that Burton was being terminated and that he would be separately provided with benefit information.

40. With his termination, most of Burton's benefits ended immediately, including eligibility for short-term and long-term disability benefits.

41. Burton and his wife had medical, dental, and vision coverage through Sappi which benefits end March 31, 2017, as reflected by the Salary Separation Information of March 2, 2017, a copy of which is attached as **Exhibit A**.

## *Request for FMLA and for Interactive Dialogue to Address Accommodations*

42. Beginning on Monday, March 6, 2017, working through Reyer, Sappi was requested by Burton to place him on FMLA leave and meet to explore accommodations for his mental health condition.

43. Reyer did not directly respond to Burton.

44. Instead, Sappi referred this matter to counsel and directed that all further communications be conducted through Sappi's counsel.

45. In furtherance of his request for FMLA leave, Burton immediately contacted Dr. Dinnerstein.

46. As a result, Burton obtained a WH-380-E Certification of Health Care Provider for Employee's Serious Health Condition ("Certification") on March 10, 2017, confirming Burton's serious medical condition and his need for leave.

47. Because of the confidentiality of the medical information included, this Certification is being provided to the Court as **Sealed Exhibit B**.

48. Counsel for Sappi was provided on March 11, 2017, with a copy of Dr. Dinnerstein's Certification and requested to confirm that this had been forwarded to Sappi.

49. When no confirmation had been received, Burton wrote a letter to Reyer on March 16, 2017, sent via email, a copy of which is attached as **Exhibit C**.

## COUNT I
## (FMLA interference triggering injunctive relief)

50. The allegations contained in Paragraphs 1 through 49 of the Complaint are incorporated herein by reference.

51. Burton was terminated on the basis that he could not perform his job due to a mental health condition which he openly shared with Sappi describing that it interfered with his concentration, caused memory difficulties and rendered him more prone to outbursts.

52. By terminating Burton with knowledge of a mental health condition which Sappi knew was interfering with his ability to perform his job and which constituted a serious health condition under the FMLA, Sappi interfered with Burton's exercise of his FMLA rights.

53. The medical certification identified in paragraphs 46-47 above provided Sappi with further evidence of Burton's eligibility for FMLA leave.

54. Terminating Burton and maintaining his termination under the above circumstances entitles Burton to injunctive relief, as expressly authorized by 29 U.S.C. §2617(a)(1)(B) and which is being pursued by Burton in an effort to minimize and mitigate potential damages.

## PRAYER FOR RELIEF

WHEREFORE, Burton prays for relief as follows:

A. That the Court enter Preliminary and Permanent Injunctions, ordering Sappi to reinstate Burton's employment and benefits retroactive to March 2, 2017;

B. That a Preliminary Injunction be issued before March 31, 2017 so that there is no lapse of medical, dental, and vision coverage or loss of benefit eligibility;

C. That Sappi process Burton's request for FMLA leave, any application for short-term disability and long-term disability benefits and initiate the interactive process contemplated by the Americans with Disabilities Act;

D. That Burton be awarded the expenses of this litigation, including reasonable attorneys' fees, costs, and expenses;

E. That Burton be granted leave to amend and expand this Complaint, whether or not injunctive relief has been awarded, to the extent necessary to assert other claims; and

F. That this Court retain jurisdiction to enforce the terms of any order entered and grant such other and further relief as many be just and proper.

## JURY TRIAL DEMAND

Pursuant to F.R.Civ.P. 38, Burton demands a jury trial on all to be asserted claims so triable.

Dated at Portland, Maine, this 27th of March, 2017.

> */s/ Robert W. Kline*
> Robert W. Kline
> Federal Bar No. 415
> Attorney for Plaintiff
> Kline Law Offices LLC
> P.O. Box 7859
> Portland, ME 04112
> (207) 772-4900
> rkline@klinelaw.me

7

# VERIFICATION

      Dale E. Burton, being duly sworn, does hereby verify the truth of the facts set forth in the foregoing Complaint as required by F.R.Civ.P. 65.

| | |
|---|---|
| <u>March 27, 2016</u> | <u>*/s/ Dale E. Burton*</u> |
| Date | Dale E. Burton |

STATE OF MAINE
COUNTY OF CUMBERLAND, ss.

      Personally, appeared the above-named Dale E. Burton and made oath that the foregoing allegations of fact are true based upon his personal knowledge except where indicated to be on information and belief, in which case he believes them to be true.

                                      <u>*/s/ Shannon R. Smith*</u>
                                      Notary Public:  *Shannon R. Smith*
                                      My commission expires:  *03/13/2020*